JiMcKAY, Judge.
Plaintiffs, Dianne Moore, Juanita Grant, Walter Hughes, Brenda Cooper and Curtis Hughes, appeal a judgement in favor of the defendant, Dr. Adrian James, et al, dismissing a mal-practice claim for the alleged misdiagnosis of pneumonia of the decedent Ms. Willie Mae Hughes. We affirm.
Plaintiffs are the adult children of Willie Mae Hughes who died while hospitalized on August 9, 1989. Of the many treating doctors who treated the decedent for over five months, Dr, James, a pulmonologist at Pen-dleton Memorial Methodist Hospital, who attended her during her last week of life was cited for malpractice.
During 1988 and 1989 Willie Mae Hughes was under repeated out-patient treatment at Charity Hospital and was diagnosed with chronic obstructive pulmonary disease. From March through July of 1989, she was treated more intensively at Charity Hospital, with a diagnosis of bronchitis. On July 19, 1989 a Charity Hospital physician gave Ms. Hughes a prescription for an antibiotic. The decedent’s daughter, Diane Moore, picked up the wrong prescription from Wal-Mart, a bottle of blood pressure tablets that were properly labeled in the name of Ranother customer. Ms. Hughes possibly took some of this drug on an irregular basis. This obviously contributed to the deterioration of Ms. Hughes condition. Wal-Mart and the druggist Mr. Douglas were dismissed from this suit.
On July 27, 1989, Ms. Hughes was admitted to the emergency room at Pendleton Memorial Methodist Hospital complaining of chills, fever, a cough and pain in her ankles and feet. She was diagnosed with pneumonia and placed on an antibiotic by the emergency room physician Dr. Gueringer. Dr. Olivio an internist was called into the case. This course of treatment was continued until the patient requested a change in doctors after a lung biopsy was ordered and performed on August 1st by Dr. Soler, and Dr. Fortenberry, with negative results. Between August 2nd and August 4th, Dr. Shelby, an internist, replaced Dr. Olivio. On August 2nd a pulmonary specialist Dr. James was called into the case. Ms. Hughes’s antibiotic treatment was temporarily discontinued for 24 hours to run certain medical test. August 5th through August 6th, Dr. James was unavailable and Dr. Davila filled in for Dr. James. On August 8th, Dr. James, after having obtained new cultures on Ms. Hughes, changed her antibiotic treatment. Additionally, he ordered a blood transfusion for the patient. The family initially refused for religious reasons. On August 9th the patient consented to the blood transfusion which was ordered by her primary physician Dr. Shelby. Although the patient showed signs of improvement and her low-grade fever had subsided, she died on August 9,1989.
|3The plaintiffs’ original petition included; Dr. Harold Shelby, Pendleton Memorial Methodist Hospital and Dr. Adrian James. The plaintiffs amended their petition to delete Dr. Shelby. On November 2, 1993 the medical review panel included three internist-pulmonologists; Drs. Edward M. Gaber, Jay M. Shames and Rian Moss Tanebaum, who heard the claim. The opinion of the medical review panel was unanimously in *189 favor of Pendelton Memorial Methodist Hospital and Dr. James. The claim against Dr. James proceeded to trial and the jury returned a judgment, dismissing plaintiffs’ claim against Dr. James.
The plaintiffs based the malpractice claim on the premise that Dr. James had not timely diagnosed a specific type of pneumonia nor did he change the patient’s antibiotic timely, resulting in a departure from the standard of care. Plaintiffs’ expert who specializes in infectious diseases, Dr. Mogabgab testified that Mrs. Hughes had a 90% probability of death because of her condition when Dr. James was first consulted on August 2, 1989 which was a full week after the decedent had been admitted to Pendleton Memorial Methodist Hospital. Dr. Mogabgab also opined that the case should have been directed against Drs. Shelby and Davila. The jury verdict in favor of Dr. James implies that the jury found the drug and treatment protocol subscribed to by the various treating physicians and the expert opinions of the medical review panelist, were proper and correct. The jury also accepted the opinions of the defense experts Drs. Shames and deBois-blanc to be more credible and convincing than the isolated opinion of plaintiffs’ expert Dr. Mogabgab.
|4The plaintiffs complain of two errors: First, the trial court committed error in entering judgment on the verdict where the deliberations and verdict were tainted by the bias of the medical review panel’s opinion. Second, the trial court committed manifest error by entering a judgment in favor of the defendant that was clearly against the weight of the evidence.
STANDARD OF REVIEW
In reviewing the factual findings of a trial court, an appellate court is limited to a determination of manifest error. Hill v. Morehouse Parish Police Jury, 95-1100 (La.1/16/96), p. 4, 666 So.2d 612, 614; Ferrell v. Fireman’s Fund Ins. Co., 94-1252 (La.2/20/95), 650 So.2d 742, 745; Stobart v. State, Through Dept. of Transp. and Development, 617 So.2d 880 (La.1993); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). The standard applies to medical malpractice suits. Richoux v. Metropolitian Gastroenterology, 522 So.2d 677 (La.App. 5 Cir.1988); Malbrough v. Hamsa, 463 So.2d 639 (La.App. 5 Cir.1984); Protti v. Tolmas, 459 So.2d 614 (La.App. 5 Cir.1984); Moore v. Healthcare Elmwood, Inc., 582 So.2d 871 (La.App. 5 Cir.1991). Our review of the record in its entirety convinces us that the jury’s findings are reasonable in light of that record. We are mindful of the standard of review of the verdict of a properly instructed jury.
“Where there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong....[Ajppellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo.... When findings are based on determinations regarding the credibility of witnesses, the manifest error — clearly wrong standard demands great deference to the trier of fact’s findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said.... [Wjhere a factfinder’s finding is based on its decision to credit the testimony of one or two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.” Rosell v. ESCO, 549 So.2d 840, 844-845 (La.1989).
15The plaintiffs allege that the jury was tainted by the testimony of Dr. Shames who appeared on the medical review panel that voted unanimously in favor of Dr. James and Pendelton Memorial Methodist Hospital because Dr. James had been a resident under Dr. Shames at Touro Infirmary.
Pursuant to La. R.S. 40:1299.47 C (3), the Medical Malpractice Act a claimant is entitled to take the deposition of the respondent physician. Furthermore, pursuant to La. R.S. 40:1299.47 C(5), all of the medical review panelist sign an oath of impartiality.
The plaintiffs had adequate time prior to the trial to have discovered this information. The proper time to raise this issue was at the medical review panel level. Only during the course of the trial did the plaintiffs’ cross-examine Dr. Shames as to his casual acquaintance with Dr. James. Dr. Shames testified *190 that he did not consider the supervisor-resident relationship that had been many years prior to this proceeding to be relevant to these proceedings. He also testified that Dr. James rotated through his internal medicine and pulmonary services at Touro Infirmary. The plaintiffs now complain that they would have objected to Dr. Shames serving on the medical review panel had he disclosed this information to them prior to convening the medical review panel. They further aver that this acquaintanceship tainted the entire proceeding because it created a bias on the part of Dr. Shames. The plaintiffs did not make any objections at trial nor did they make any motion for the trial court to rule on concerning this issue. We disagree with the plaintiffs’ contentions. These allegations are without merit.
|6The plaintiffs in their second assignment of errors assert that the verdict and judgment based on the insufficiency of the evidence, in favor of Dr. James should be reversed. The burden of proof is clearly on the plaintiff to prove that the standard of care fell below the accepted standard of care. The burden of proof in a malpractice suit is governed by statute, La. R.S. 9:2794(A). A medical malpractice claimant carries a burden of proof that is two-fold. The plaintiff must establish by a preponderance of the evidence that the treatment was below the standard of care for particular specialties and there was a causal relationship between the alleged negligent treatment and the injury sustained. Martin v. East Jefferson General Hospital, 582 So.2d 1272, 1276 (La.1991); Smith v. State through Dept. of Health and Human Resources Admin., 523 So.2d 815, 819 (La.1988); Pfiffner v. Correa, 91-2734 (La.App. 4 Cir. 1/13/94), 640 So.2d 281, 286, reversed on other grounds, 94-0924 (La.10/17/94), 643 So.2d 1228.
In the instant case the plaintiffs’ only expert witness was a specialist in infectious diseases, Dr. Mogabgab. He testified that there was a probability that the decedent would die as a result of her illness even prior to Dr. Adrian James being brought on the case. He opined that the decedent had atypical pneumonia as opposed to the common form of pneumonia, which required a different antibiotic, than the decedent was receiving. Nevertheless, he never adequately supported the plaintiffs’ claim that the care provided by Dr. James to the decedent was below the standard of care for his specialty. The defendants presented at trial various medical records of the decedents medical history from both Charity Hospital and Pendleton Memorial Methodist Hospital that verified that the decedent had a long 17history of lung disease and treatment. Also the defendants presented expert testimony from a pulmonary and critical care specialist, Dr. deBoisblanc who opined that the decedent’s illness was the same illness that she had been treated for at Charity Hospital nine days before being admitted to Pendleton Memorial Methodist Hospital. He reviewed the case retrospectively and only after an autopsy had been performed on the decedent did he opine that the decedent never had pneumonia, but that she had an extremely rare disease called Wagner’s granulomatosis which was the ultimate cause of her death. He also testified that this disease is most often diagnosed post-mor-tem. Additionally, he testified that test for the diagnosis of Wagner’s granulo'matosis was not available at that time of the death of Ms. Hughes. Dr. Shames, who had been on the medical review panel that had exonerated Dr. James and Pendleton, was also an expert for the defendant. His review of the entire medical record of the decedent concluded that Dr. James properly treated the decedent. Finally, Dr. James testified in his own behalf as to his exact involvement in the decedent’s case while at Pendleton Memorial Methodist Hospital.
The jury clearly weighed the evidence and accepted the opinion of the defendant’s experts and rejected the alternative position of Dr. Mogabgab. As the Louisiana Supreme Court has repeatedly instructed, when the jury makes a choice among alternative reasonable hypotheses, it is virtually impossible to find reversible error. Rosell v. ESCO, supra. The jury’s evaluation of the evidence and its credibility call were appropriate and correct. Accordingly, plaintiffs’ weigh of the *191 evidence specification of error is without merit. The trial court is affirmed.
IgAFFIRMED.