CARAWAY, J.
In this medical malpractice action, plaintiff asserts that his surgeon was required to inform him prior to elective surgery of the surgeon’s own eye surgery which had occurred eight days earlier. The trial court granted summary judgment in favor of the defendant physician after determining that there existed no genuine issue of material fact regarding breach of the standard of care. We affirm.

Facts

On September 21, 2007, urologist, Dr. Don Marx, performed an elective vasectomy on John Roberts. The vasectomy procedure involves the separation of blood vessels from the vas which is then cauterized and tied off. Before performing the procedure on Roberts, Dr. Marx discussed possible risks and complications of the surgery which included bleeding, hematoma due to the involvement of blood vessels and epididymitis, the inflammation of the epididymis. According to Dr. Marx, the surgery was uneventful. In subsequent follow-up visits with Dr. Marx, however, Roberts reported swelling and tenderness of the left hemiscrotum. Ultimately an ultrasound showed that Roberts had a possible (due to the mass’s atypical appearance) hematoma, meaning bleeding in the scrotum from the surgery. Although Roberts denies this fact, Dr. Marx recalled that he discussed exploratory surgery or continued conservative treatment including bed rest, heat and elevation for resolution of the condition. Dr. Marx also prescribed antibiotics and anti-inflammatory medication to Roberts. According to Dr. *464 Marx, it was Roberts who chose to wait on surgery.
On October 12, 2007, Roberts presented to Dr. Marx with a 102 degree temperature. Dr. Marx immediately admitted Roberts to the hospital after observing that the swelling had become “red and tender and was consistent with infection.” Dr. Marx performed follow-up surgery on Roberts on October 15 and discovered a staph infection which was drained, packed and left open. Roberts received two days of antibiotics and wound care and was returned to the operating room on October 17 for debridement of the wound and an epididymectomy. Roberts remained in the hospital until mid-November 2007. A final semen check on November 27, 2007 indicated that the procedure was successful.
It is undisputed that Dr. Marx had undergone retinal detachment repair surgery on September 13, 2007, after losing part of his visual field in his right eye the previous day. Before the event, Dr. Marx had 20/25 vision in his right eye and he wore glasses. The successful eye surgery was performed by ophthalmologist, Dr. Joseph Barron. The day after the surgery, Dr. Marx’s vision had improved to 20/100 in the right eye. Dr. Barron explained that this meant that Dr. Marx was seeing at 20 feet what a normal eye would see at 100 feet. On a subsequent visit on September 19, 2007, Dr. Marx complained of right eye irritation which Dr. Barron determined was caused by a suture that he trimmed. Dr. Marx’s vision had improved to 20/80 plus one (meaning Dr. Marx could read one letter on the 20/70 line) by this date. Dr. Marx did not work for a week after the surgery.
On September 24, 2007, Dr. Marx’s vision had improved to 20/70. Dr. Barron did not discuss Dr. Marx’s return to surgery with him because that was something he would have to decide on his own. He did not recall that Dr. Marx told him anything about his having trouble doing surgery. Dr. Barron indicated that if Dr. Marx had complained about this, he would have recommended that he use magnifying glasses which “would really help.” Dr. Barron placed Dr. Marx on no restriction other than exercising.
By his October 24, 2007 visit, Dr. Marx’s vision had improved to 20/30. Ultimately his corrective prescription was changed but Dr. Marx felt that his eyesight was “restored pretty closely to what I was seeing before surgery.” He did utilize a magnifying loupe to perform surgery, including Roberts’ surgery, the first week he returned to work because it made him feel comfortable.
Roberts submitted a complaint against Dr. Marx to a medical review panel which rendered an opinion favorable to Dr. Marx, finding that Dr. Marx had appropriately performed the vasectomy with Roberts’ consent to the material risks for the procedure. The panel concluded that Dr. Marx had no obligation to disclose to Roberts the prior eye surgery, that Dr. Marx had been released by his doctor to return to his medical practice, and that his actions met the applicable standard of care.
Subsequently, on November 17, 2010, Roberts filed this action seeking damages for his alleged failure to provide appropriate medical care and treatment relating to Dr. Marx’s impaired vision and treatment and diagnosis of the subsequent complications.
Dr. Marx and his insurer moved for summary judgment and included a copy of the medical review panel opinion in support of that motion. Copies of Roberts’ discovery responses which identified no medical doctor as an expert witness for the case were attached to the motion. In light of the medical review panel opinion that did not support plaintiffs claims and the lack of expert testimony to establish a *465 breach of the standard of care, Dr. Marx argued that Roberts would be unable to sustain his burden of proof at trial.
Roberts opposed the summary judgment on the grounds that no expert testimony was required to prove lack of informed consent which occurred when Dr. Marx failed to inform Roberts of his vision problems prior to surgery. He also argued that contested issues of fact existed as to whether Dr. Marx informed him that he could have surgery when the hematoma was diagnosed. Roberts included his affidavit which stated that he would not have elected to have the vasectomy at that time if he had been advised of Dr. Marx’s eye surgery and that he was not given the choice of surgery by Dr. Marx when the hematoma was ultimately diagnosed. Roberts also contended that he overheard Dr. Marx’s nurse state that the physician had obtained the jeweler’s loupes he utilized from a flea market.[1] Roberts also included the depositions of Drs. Barron and Marx which were consistent with the facts as set forth above.
After hearing the arguments of counsel and considering the memoranda and exhibits submitted by the parties, the trial court determined that no genuine issue of material fact existed and that Roberts had not shown that he could meet his burden at trial regarding the breach of the standard of care by Dr. Marx. This appeal by Roberts ensued.

Discussion

On appeal, Roberts argues that the trial court erred in finding that he could not carry his burden of proof that Dr. Marx failed to obtain his informed consent prior to surgery and in determining that the lack of expert testimony defeated his claims.
A motion for summary judgment is a procedural device used when there is no genuine issue of material fact for all or part of the relief prayed for by a litigant. Samaha v. Rau, 07-1726 (La.2/26/08), 977 So.2d 880; Duncan v. U.S.A.A. Ins. Co., 06-368 (La.11/29/06), 950 So.2d 544.
A summary judgment is reviewed on appeal de novo, with the appellate court using the same criteria that govern the trial court’s determination of whether summary judgment is appropriate; i.e. whether there is any genuine issue of material fact, and whether the movant is entitled to judgment as a matter of law. Samaha, supra; Wright v. Louisiana Power & Light, 06-1181 (La.3/9/07), 951 So.2d 1058; King v. Parish National Bank, 04-0337 (La.10/19/04), 885 So.2d 540.
A motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B). The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action. The procedure is favored and shall be construed to accomplish these ends. Samaha, supra.
The burden of proof at the hearing on the motion for summary judgment is on the mover (normally the defendant), who can ordinarily meet that burden by submitting affidavits or by pointing out the lack of factual support for an essential element in the opponent’s case. At that point, the party who bears the burden of persuasion at trial (usually the plaintiff) must come forth with evidence (affidavits or discovery responses) which demon *466 strates he or she will be able to meet the burden at trial. Once the motion for summary judgment has been properly supported by the moving party, the failure of the nonmoving party to produce evidence of a material factual dispute mandates the granting of the motion. Id.
The present motion for summary judgment was presented in the context of a suit for medical malpractice. To establish a claim for medical malpractice, a plaintiff must prove, by a preponderance of the evidence: (1) the standard of care applicable to the defendant; (2) that the defendant breached that standard of care; and (3) that there was a causal connection between the breach and the resulting injury. La. R.S. 9:2794; Samaha, supra; Gleason v. Louisiana Dept. of Health & Hospitals, 44,947 (La.App.2d Cir.3/10/10), 33 So.3d 961, writ denied, 10-0783 (La.6/25/10), 38 So.3d 338. Expert testimony is generally required to establish the applicable standard of care and whether or not that standard was breached, except where the negligence is so obvious that a lay person can infer negligence without the guidance of expert testimony. Samaha, supra; Pfiffner v. Correa, 94-0924, 94-0963, 94-0992 (La.10/17/94), 643 So.2d 1228; Gleason, supra. In this type of medical malpractice action, expert testimony is also required to establish whether a breach of the standard of care caused injury to the plaintiff. Schultz v. Guoth, 10-0343 (La.1/19/11), 57 So.3d 1002.
Louisiana’s informed consent law is contained in La. R.S 40:1299.40 and provides the standards for written consent to medical treatment in Louisiana. This law provides that the sole cause of action relating to informed consent sounds in negligence. Thibodeaux v. Jurgelsky, 04-2004 (La.3/11/05), 898 So.2d 299, writ denied, 04-2126 (La.6/17/05), 904 So.2d 707. The informed consent law also generally provides that a patient give written consent to a procedure only after being informed of any known and material risks. Thus, a doctor’s duty of disclosure to a patient includes only those risks that are material. Jackson v. State, 05-2021 (La.9/29/06), 938 So.2d 688. A risk is material when a reasonable person would be likely to attach significance to the risk or cluster of risks in deciding whether or not to forgo the proposed therapy. Brandt v. Engle, 00-3416 (La.6/29/01), 791 So.2d 614. The determination of materiality is a two-step process. The first step is to determine the nature and existence of the|srisk and the likelihood of its occurrence. The second step is for the trier of fact to determine whether the probability of that type of harm is a risk to which a reasonable person in the patient’s position probably would attach significance. Id. However, a plaintiff can only recover damages for a doctor’s failure to disclose a material risk only if causation is proven. Causation is established only if adequate disclosure reasonably would be expected to have caused a reasonable person to decline treatment because of the disclosure. Id.
A physician’s failure to disclose chronic alcohol abuse to patient and wife has been held to constitute a material risk associated with the physician’s ability to perform, which if disclosed would have obliged the patient to have elected another course of treatment. Hidding v. Williams, 578 So.2d 1192 (La.App. 5th Cir.1991).
The undisputed facts brought forth by Dr. Marx are (1) Roberts’ hematoma and related complications were known and material risks that might have been expected from the surgery, (2) Roberts was advised of the hematoma risk and consented to the surgery, and (3) Dr. Marx was released by his doctor to perform acts in his medical practice. There were other circumstances and their implications surrounding Dr. Marx’s actions that were not in any way disputed or called into question by Rob *467 erts. Dr. Marx’s slight deficiency in eyesight affected one eye and its effect on his near vision with the additional aid of the loupe magnification was not explained or shown to be inadequate by a defense expert.[2] Additionally, the surgical objective of the vasectomy was not otherwise shown by Roberts to have been unsuccessful. Finally, Dr. Marx’s return to his normal practice by September 21 was not shown by Roberts to have caused any problems with his other patients’ care.
This direct and circumstantial evidence first required Roberts to bring forth evidence showing that the known hematoma risk, which by definition may be caused by the physician’s nonnegligent actions and has a probability generally associated with the surgery, was more probably caused in this case by Dr. Marx’s negligence. The slight circumstantial inference that Roberts urges because of the fact of Dr. Marx’s prior surgery does not in our opinion demonstrate such factual support for Roberts’ essential element of proof of causation so as to create a genuine issue of material fact.
Second, a physician’s inability to perform surgery because of his impaired physical condition is not a matter concerning informed consent of the patient but negligence of the physician. Here, Roberts did not produce evidence that showed that any slight vision impairment of Dr. Marx that may have existed at the time of Robert’s surgery was not otherwise corrected by Dr. Marx’s use of the loupe magnification. The expert testimony missing from Roberts’ opposition to the motion for summary judgment was necessary evidence to dispute Dr. Barron’s assessment of Dr. Marx’s ability to return to his medical practice.
Finally, although not presented to the medical review panel, Roberts insists that Dr. Marx was negligent in advising Roberts “to wait and see” after his complications developed instead of having immediate surgery for the hematoma. Leaving Dr. Marx’s contradictory testimony aside, this claim would have also required expert medical testimony to demonstrate that Roberts might be successful in proving such negligence at trial. Accordingly, Roberts has not raised a material issue of fact that Dr. Marx’s treatment for the hematoma fell below the standard of care.

Conclusion

For the foregoing reasons, the judgment of trial court is affirmed. Costs of this appeal are assessed to Roberts.
AFFIRMED.
APPLICATION FOR REHEARING
Before BROWN, WILLIAMS, STEWART, CARAWAY and DREW, JJ.
Rehearing denied.

. In his opposition argument to the summary judgment, Roberts indicated that Dr. Marx admitted to him that he had made a mistake. Roberts’ affidavit, however, contains no such statement.

. It is unclear from Dr. Barron's discussion of the deficiency in Dr. Marx's vision following his eye surgery whether the deficiency applied to his near or far vision, or both.